## FULLER *v.* The STATE.

Cases may sometimes occur, where the refusal of the Court below to grant a continuance, can be assigned for error.

If there be a total default of jurors on the return of the *venire*, a new one must issue; but if any number, however small, appear, and they be set aside on challenge, 12 *tales-men* may be sworn to try the issue.

Where a statute *creates* an offence which did not exist at common law, the indictment should conclude *contra formam statuti*: Aliter, where the statute is merely declaratory of the common law.

By the constitution, the circuit judge must be present at the trial of capital cases; but he may be overruled by the judgment of the associate judges.

The *benefit of clergy* is unknown to our laws.

ERROR to the *Dearborn* Circuit Court.—This was an indictment for murder. Plea, the general issue. The jury found the prisoner guilty; and sentence of death was accordingly pronounced against him.

BLACKFORD, J.—There are many errors assigned, all of which have been carefully examined. It cannot, however, be expected, that particular notice should be taken of each of them, in the opinion about to be delivered. The following points, noted in their brief by the counsel for the plaintiff in error, were principally relied upon in the argument of this very important cause.

*First.* "The indictment is not good, because it purports to have been found by a grand jury of the *Dearborn* Circuit; and because the record does not show that they were good and lawful men."

The commencement of the indictment is as follows: "The grand jurors for the state of *Indiana*, impanelled and sworn in and for the body of the *Dearborn* Circuit, which is composed of the county of *Dearborn*," &c. Here are more words, to be sure, than necessary, but there is no obscurity. We are expressly informed by the jury, that, by the *Dearborn* Circuit, they mean the

county of *Dearborn.* Besides, the caption of the indictment states that these jurors "were impanelled," &c., "for the body of the county of *Dearborn.*" By this caption we also find, that "*Archibald Moore,* foreman," and the others (naming them) "his fellows, *good and lawful householders,*" &c., composed this grand inquest. The record therefore states them to be such persons as the statute requires (1).

*Secondly.* "There should have been a continuance on the affidavits."

Where a party has a clear and unquestionable right to a continuance of his cause, it is the duty of the Court to grant it; but this is always an application to their sound, legal discretion, and generally depends upon a variety of circumstances with which the Court below alone can be acquainted. The Supreme Court of the *United States* have decided, that in no case of this kind can a party be relieved by a writ of error. 6 Cranch, 218. The opinions of the Superior Courts of some of our sister states upon this subject, are contradictory. We have determined, that there may exist cases where a refusal of the Court below to grant a continuance, may be assigned for error (2); and upon a reconsideration of the question, we are *not dissatisfied* with that opinion. Such cases, however, requiring the interposition of this Court, can but very seldom occur. On looking carefully into both the affidavits, upon which a continuance of this case was prayed, we are not prepared to say that there were no circumstances connected with the cause, sufficient to justify the refusal.

*Thirdly.* "The panel of the jury should have been quashed."

Here was a challenge to the array. The record does not show that there was an appearance of a full jury previous to the challenge, which ought to have been the case. Bull. N. P. 307. —1 Chitt. Crim. Law, 544 (3). We will not stop to inquire how far that circumstance can affect the case, as it does not appear to the Court that the reasons upon which the challenge was founded, can be supported. One of the causes of challenge assigned must be particularly noticed, as it has been relied upon with more than ordinary confidence. It is founded upon the statute of 1817, regulating the mode of summoning jurors. By the provisions of that statute, the county commissioners are directed, at their meeting in every year when they receive the list of taxable property, to select from such list a certain num-

ber of householders to serve as jurors. It appears by the record, that this selection was made at the *August* term, 1819; and we have no evidence that this was not their first meeting after the list of taxable property had been received. It was, to be sure, the duty of the lister to make his returns to the preceding *May* term of the commissioners' Court, but we have no means of determining whether he did so or not. On this subject the record is silent. We cannot know that the commissioners had it in their power, at an earlier period than their meeting in *August*, to make a selection of jurors in conformity with the statute. The objection, therefore, to the array, that the jurors were not selected at the *May* term of the commissioners' Court, is of no validity; and, of course, it becomes unnecessary to inquire, whether any such objection, had it really existed, could have supported a challenge to the array.

*Fourthly.* "It was error to issue a *tales de circumstantibus*, as none of the jurors of the original panel were retained."

We are of opinion that the award of a *tales* was proper, although the panel had been exhausted by the prisoner's challenges. The true doctrine on the subject we believe to be this: where none of the jury summoned upon the first panel appear, a new venire ought to issue; but if one of the jurors only attend the Court, in obedience to the first summons, and he be challenged and rejected, there may be twelve *tales-men* sworn to determine the issue. 3 Bac. Abr. 745 (4).

*Fifthly.* "An indictment for murder, cannot be supported in this state, at common law."

The objection is, that the indictment does not conclude against the form of the statute, but "contrary to law." Upon this point there is no kind of difficulty. We have adopted the common law of *England;* and, as it respects the crime of murder, our statute and the common law go hand in hand. The description of the offence, and the nature of the punishment, are the same in both. If an offence at common law be prohibited by statute, this takes not away the indictment at common law. To be sure, when an offence is entirely *created* by statute, the indictment ought to conclude *contra formam statuti.* But where the crime, as in the present case, is of common law origin, and the statute on the subject is merely declaratory of the common law,

FULLER
v.
THE STATE.

the indictment is good without such a conclusion. 1 Chitt. Crim. Law, 289, 290.—3 Bac. Abr. 571.

We have now considered the errors assigned, which were particularly insisted upon. There are many others, but the most of them were correctly abandoned in the course of the argument. It is contended that the proceedings are erroneous, because the opinion of the presiding judge was overruled by his associates, during the progress of the trial. By the constitution of the state, the two associate judges, in the absence of the president, are competent to hold a Court, except in capital cases and cases in Chancery. In the cause now under consideration, the presiding judge was present, and constituted a component part of the Court. His associates had an opportunity of consulting with him upon the questions arising in the cause, and of availing themselves of his legal information in forming their opinions; but each of the judges, as an independent member of a competent judicial tribunal, was bound to express his opinion; and the determination of a majority, was the constitutional judgment of the Court.

It is said that the Court below erred in refusing to the prisoner the *benefit of clergy.* As to this objection, there surely can be but one opinion. The benefit of clergy never was properly a common law privilege. 1 Chitt. Crim. Law, 667. It originated with that of sanctuary in the gloomy times of popery. It was the offspring of that absurd and superstitious veneration for a privileged order in society, which unfortunately existed in those ages of darkness, when the persons of clergymen were considered sacred, and church yards were viewed as consecrated ground. The statutes of *England* on the subject are local to that kingdom. They were not made in aid of the common law, and are certainly not adopted as the laws of our country.

*Per Curiam.*—The judgment is affirmed.

*Dewey, Caswell,* and *M'Donald,* for the plaintiff.

*Test* and *Lane,* for the state.

(1) Ind. Stat. 1817, p. 300.—Acc. Ind. Stat. 1823, p. 235.

(2) *Vanblaricum* v. *Ward,* ante, p. 50.

(3) If 12 of those named in the original panel do not appear, a *tales* must

be prayed, and the appearance of 12 obtained, before any challenge either to the *array* or to the *polls* can be made.   The *King* v. *Edmonds*, 4 Barnew. and Ald. 471.

(4)   1 Chitt. Crim. Law, 518.